**UNITED STATES, Plaintiff,**

v.

**Thurston Paul BELL, Defendant.**

**Civil No. 1:CV–01–2159.**

United States District Court,
M.D. Pennsylvania.

Jan. 10, 2003.

Martin C. Carlson, Anne K. Fiorenza, Assistant U.S. Attorney, Harrisburg, PA, Evan J. Davis, Donald N. Dowie, Washington, DC, for Plaintiff.

Thurston Paul Bell, Hanover, PA, Pro Se.

## MEMORANDUM

CONNER, District Judge.

Before the court[1] is the United States' motion for preliminary injunction. (Doc. 34). The parties have fully briefed the issues, and the matter is ripe for disposition.

### I. Factual Background

Defendant Thurston Bell ("Bell") has fashioned a career by devising and publicizing ways to avoid paying federal income tax. Bell acknowledges that he has "dealt with the issue of taxes for eight and a half years on the edge of what would be seen as legal. . . ." Transcript of November 4, 2002 preliminary injunction hearing ("N.T."), pg. 28. A brief explanation of Bell's career as a tax protester is appropriate to put the United States' motion for preliminary injunction in context.

In the 1980s, Bell worked for Save–A–Patriot, "[a]n organization that believes that American citizens are not liable for income tax." (Doc. 36, Exhibit J, pg. 13). (See also Doc. 36, Exhibit C, pg. 66). As a case worker at Save–A–Patriot, Bell helped clients "avoid paying taxes or any number of other things that could happen as a result of not paying taxes." (Doc. 36, Exhibit J, pg. 17).

When Bell left Save–A–Patriot, he cofounded Tax-gate and created the tax-gate.com website. (Doc. 36, Exhibit C, pp. 16–17). At Tax-gate, Bell drafted court pleadings and letters to the Internal Revenue Service ("IRS") and state taxing agencies on his clients' behalf. (Doc. 36, Exhibit J, pg. 25). See also id. at Exhibit 19 (letter dated January 27, 1998, outlining Bell's tax avoidance argument). Bell charged his clients for tax advice and for preparation of documents directed to taxing authorities. (Doc. 36, Exhibit J, pg. 32). (See also Doc. 36, Exhibit K, pg. 88) (deposition testimony that Bell charged a $1,000.00 retainer before discussing certain tax matters).

Between 1998 and 2000, Bell established the National Institute for Taxation Education ("NITE"). On the NITE website,[2] Bell asserts, "The National Institute for Taxation Education (NITE) provides income tax help, solutions, and strategies that work for Citizens of the United States to legally declare their gross income to be

---

1. By Order dated September 25, 2002, this matter was transferred to the undersigned. (Doc. 74).

2. The NITE website currently shares a link with the Tax-gate.com website. (Doc. 36, Exhibit C, pg. 16).

Zero." (Doc. 36, Exhibit C, pg. 16). Bell's tax avoidance argument is commonly referred to as the "Section 861 argument" or the "U.S. Sources argument."

The Internal Revenue Code defines "gross income" as "all income from whatever source derived...." 26 U.S.C. § 61(a). Bell claims that the word "source" in section 61 is defined in the "Source Rules and Other General *Rules Relating to Foreign Income*." 26 U.S.C. §§ 861–865 (emphasis supplied). Section 861 states that certain "items of gross income shall be treated as income from sources within the United States...." 26 U.S.C. § 861(a). According to the U.S. Sources argument, domestically earned wages of U.S. citizens are not taxable because such wages are not *specifically* mentioned in the list of items of gross income that "shall be treated as income from sources within the United States." *See* 26 U.S.C. § 861(a). Bell concedes that section 861 itself does not *exempt* domestically earned wages of U.S. citizens.[3] Nevertheless, he argues that such wages are not taxable because certain regulations promulgated under section 861 (*i.e.* 26 C.F.R. §§ 1.861–8(a)(4), 1.861–8(f)(1), and 1.861–8T(d)(2)(ii)(A)) create an applicable exemption.

Bell's clients typically file zero income tax returns with an "asseveration of claimed income" attached, disputing the gross income indicated on the taxpayer's W–2 forms. (Doc. 36, Exhibit K, pg. 53). *See also* N.T. 59–60. When this method fails, Bell argues that the IRS has violated his clients' due process rights by not allowing them to cross-examine their employers regarding the gross income listed on their W–2 forms. (Doc. 36, Exhibit J, pg. 63). Bell's goal in seeking to cross-examine em-

ployers is to show an absence of gross income according to the fallacious U.S. Sources argument outlined above. (Doc. 36, Exhibit J, pg. 63). Bell's methods have secured erroneous tax refunds for numerous clients. (*See, e.g.,* Doc. 36, Exhibit C, pg. 64–65).

On November 4, 2002, the court held a hearing on plaintiff's motion for a preliminary injunction. On November 19, 2002, Bell filed a response to plaintiff's supplemental memorandum of law (Doc. 85), exhibits in support thereof (Doc. 86), and an additional deposition transcript. (Doc. 87).

## II. *Legal Standard*

■ Plaintiff seeks preliminary injunctive relief under 26 U.S.C. § 7402. The court is authorized to grant such relief "as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402. A preliminary injunction under section 7402 is governed by the same standard as a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. *U.S. v. Rosile*, 2002 WL 1760861 *1 (M.D.Fla.2002); *U.S. v. Bosset*, 2002 WL 1058105 *1 (M.D.Fla. 2002). The court must evaluate four factors: (1) likelihood of success on the merits; (2) irreparable harm resulting from a denial of the relief; (3) the harm to the non-moving party if relief is granted; and (4) the public interest. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999) (citing *A.C.L.U. of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)) (*en banc*); *Rosile*, 2002 WL 1760861 *1. As the party seeking preliminary injunctive relief, the United States bears the burden of proof. *Mettler–Toledo, Inc. v. Acker*, 908 F.Supp. 240, 245 (M.D.Pa.1995). "The

**3.** No doubt Bell makes this concession because section 861 plainly provides that "[c]ompensation for labor or personal ser-

vices performed in the United States ..." shall be treated as income from sources within the United States. 26 U.S.C. § 861(a)(3).

injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods.*, 963 F.2d 628, 632–33 (3d Cir.1992).

### III. *Discussion*

#### A. *Likelihood of Success on the Merits*

In order to prevail on the merits, the United States must establish that an injunction is "necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402. Plaintiff argues that it is likely to succeed on the merits because "the § 861 Argument is completely meritless" and because Bell blindly insists on the argument's validity, "despite overwhelming evidence to the contrary." (Doc. 35, pg.23). The court agrees with plaintiff.

Section 61(a) of the Internal Revenue Code states in pertinent part:

> Except as otherwise provided in this subtitle, gross income means all income from *whatever source* derived ... including (but not limited to) ... [c]ompensation for services, including fees, commissions, fringe benefits, and similar items....

26 U.S.C. § 61(a) (emphasis supplied).

■ The Supreme Court has "repeatedly emphasized the 'sweeping scope' of [section 61(a) ] and its statutory predecessors." *C.I.R. v. Schleier*, 515 U.S. 323, 327–28, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995) (citing *C.I.R. v. Glenshaw Glass Co.*, 348 U.S. 426, 429, 75 S.Ct. 473, 99 L.Ed. 483 (1955); *United States v. Burke*, 504 U.S. 229, 233, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992); *Helvering v. Clifford*, 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788 (1940)). When it defined gross income, Congress intended "to use the full measure of its taxing power." *Glenshaw Glass*, 348 U.S. at 429, 75 S.Ct. 473. Moreover, it is well-settled that wages or compensation for services constitute income and that individuals receiving income are subject to the federal income tax. *See, e.g.,* 26 U.S.C. § 61(a)(1); *Central Illinois Public Service Co. v. U.S.*, 435 U.S. 21, 25, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), *U.S. v. Connor*, 898 F.2d 942, 943–44 (3d Cir.1990); *Coleman v. Commissioner*, 791 F.2d 68, 70 (7th Cir.1986).

Bell's U.S. Sources argument is nonsensical. It rests purely on semantics and takes the regulations promulgated under section 861 out of context.[4] As noted by the Tax Court in *Christopher v. C.I.R.*, 2002 WL 71029 *3 (U.S. Tax Ct.2002):

> The rules of sections 861–865 have significance in determining whether income is considered from sources within or without the United States. The source rules do not exclude from U.S. taxation income earned by U.S. citizens from sources within the United States.

*See also Great–West Life Assur. Co. v. United States*, 230 Ct.Cl. 477, 678 F.2d 180, 183 (1982) ("The determination of where income is derived or 'sourced' is generally of no moment to either United States citizens or United States corporations, for such persons are subject to tax

---

**4.** The illogical nature of Bell's U.S. Sources argument can best be described by reference to the following quote from the Seventh Circuit in *Coleman v. Commissioner*, 791 F.2d 68, 69 (7th Cir.1986):

> Some people believe with great fervor preposterous things that just happen to coincide with their self-interest. "Tax protesters" have convinced themselves that wages are not income, that only gold is money, that the Sixteenth Amendment is unconstitutional, and so on. These beliefs all lead—so tax protesters think—to the elimination of their obligation to pay taxes.

under I.R.C. § 1 and I.R.C. § 11, respectively, on their worldwide income."). Other jurisdictions which have heard this U.S. Sources argument have uniformly found it unpersuasive. *See, e.g., Loofbourrow v. C.I.R.*, 208 F.Supp.2d 698, 709–10 (S.D.Tex.2002) ("Loofbourrow's argument, however, is misplaced and takes the regulations out of context."); *In re Clark*, 2001 WL 1807509 (Bankr.E.D.N.Y.2001) (holding that 26 C.F.R. §§ 1.861–1 to 1.861–8, and 1.861–8T do not exempt U.S. citizens' domestic income from taxation); *Madge v. C.I.R.*, 23 Fed.Appx. 604, 2001 WL 1414315 *1 (8th Cir.2001) ("[T]he Tax Court properly rejected Madge's contention that the income from his business was not 'gross income' under 26 U.S.C. § 61(a)"); *Williams v. Commissioner*, 114 T.C. 136, 138–139, 2000 WL 230343 (2000) (rejecting claim that income is not subject to tax because it is not from any of the sources listed in 26 C.F.R. § 1.861–8(a)).

The regulations cited by Bell—26 C.F.R. §§ 1.861–1 to –8 and 26 C.F.R. § 1.861–8T—were promulgated for the purpose of interpreting 26 U.S.C. § 861. Section 861 "does not define gross income; it provides which items of gross income shall be treated as income from sources within the United States, and also provides, at § 1.861–8, for the allocation and apportionment of deductions between statutory groupings of gross income for the purpose of calculating taxable income" for nonresident aliens and foreign corporations. *In re Clark*, 2001 WL 1807509 *6 (Bankr.E.D.N.Y.2001). *See also Great–West Life*, 678 F.2d at 183–84 n. 8 (describing bifurcated taxing pattern applicable to nonresident aliens and foreign corporations). To suggest that these regulations create an exemption for domestic wages of U.S. citizens is irresponsible and frivolous advocacy. *See* 26 C.F.R. § 1.861–4 (providing that gross income from sources within the United States includes compensation for labor or personal services performed in the United States).

For all of the foregoing reasons, the court finds a substantial likelihood that the United States will prevail on the merits. *Accord U.S. v. Rosile*, 2002 WL 1760861 *1; *U.S. v. Bosset*, 2002 WL 1058105 *1. The court also finds that enjoining Bell from selling this frivolous tax argument is "necessary [and] appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402. Bell testified that he intends to continue to promote the U.S. Sources argument. N.T. at 47. On the NITE website, Bell boasts that the U.S. Sources argument has resulted in eight "Employer IRS Refunds," three "IRS Abatements," and thirteen "Individual IRS Refunds / Credits" for his clients. (Doc. 36, Exhibit C, pg. 65). Every time Bell convinces another individual to file false tax returns under the U.S. Sources argument, the internal revenue laws are thwarted. The court will not countenance such impropriety.

**B.** *Irreparable Harm*

The United States argues that it will suffer irreparable harm if an injunction is not issued because processing, investigating, and correcting the false tax returns filed by Bell's clients "requires substantial IRS resources." (Doc. 35, pg.23). Plaintiff also argues that, while future harm is certain unless the court enjoins Bell, the timing and magnitude of such harm would be impossible to ascertain.

The Third Circuit has stated that: In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm.

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir.1992) (citations omitted) (emphasis in original). *See also Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 595 (3d Cir.2002) (defining irreparable harm as "potential harm that cannot be redressed following trial").

Absent injunctive relief, Bell will likely cause the government and law abiding taxpayers great harm. Due to the nature of Bell's conduct, i.e. providing harmful tax advice, it is impossible to determine the degree to which this conduct will injure the United States in the future; one cannot estimate with any precision the government resources potentially lost in tracking down the maze of erroneous returns filed by Bell's clients or the amount of refunds improperly paid to Bell's clients. The court notes with interest that Bell "ghostwrites" his clients' returns—his name never appears on the individual 1040 forms or on his clients' correspondence to the IRS. (Doc. 35, pg. 23 & Doc. 36, Exhibit J, Exhibits 9, 19 & 29).

For all of the foregoing reasons, the court finds that plaintiff has met its burden to demonstrate irreparable harm. *Accord U.S. v. Rosile*, 2002 WL 1760861 *1; *U.S. v. Bosset*, 2002 WL 1058105 *1.

## C. *Balance of Harms*

Plaintiff argues that the threatened injury to the United States outweighs any injury an injunction will cause defendant, because an injunction would merely require Bell to comply with the law. Bell, on the other hand, argues that an injunction would violate his First Amendment right to freedom of speech. Bell supports his argument with a miscellaneous collection of Supreme Court and Third Circuit quotes taken out of context. For example, Bell quotes *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) and *American Library Ass'n, Inc. v. U.S.*, 201 F.Supp.2d 401, 479 (E.D.Pa.2002), stating that "[t]he separation of legitimate from illegitimate speech calls for sensitive tools.[5] The First Amendment demands the precision of a scalpel, not the sledgehammer." [6] *See* N.T. at 25. However, both of these cases deal with regulation of obscenity and neither stands for the proposition that the First Amendment protects the sale or advocacy of false tax advice. *See Bantam Books*, 372 U.S. at 66, 83 S.Ct. 631 ("[T]he Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression...."); *American Library*, 201 F.Supp.2d at 490 (finding the Children's Internet Protection Act facially invalid).

Despite the inapplicability of the case law argued by Bell, an injunction prohibiting him from engaging in false speech concerning the U.S. Sources argument would amount to a prior restraint. *See Alexander v. U.S.*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) ("Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints."). Prior restraints are generally presumed unconstitutional. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("Any system

---

5. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

6. *American Library*, 201 F.Supp.2d at 479. *American Library* is the opinion of a three-judge panel of the District Court for the Eastern District of Pennsylvania, penned by Chief Judge Edward R. Becker of the Third Circuit Court of Appeals.

of prior restraint, however, 'comes to this Court bearing a heavy presumption against its constitutional validity.' "). However, not all prior restraints are prohibited. *Near v. State of Minnesota ex rel. Olson,* 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

### i. *Bell's False Commercial Speech*

■ Bell contends that the majority of his speech is political speech, as opposed to commercial speech. The court disagrees. Commercial speech is "broadly defined as expression related to the economic interests of the speaker and its audience, generally in the form of a commercial advertisement for the sale of goods and services." *In re Orthopedic Bone Screw Products Liability Litigation,* 193 F.3d 781, 793 (3d Cir.1999) (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 933 (3d. Cir.1990)).

■ To determine whether speech is "commercial speech" the court must evaluate whether:

(1) the speech is an advertisement;

(2) the speech refers to a specific product or service; and

(3) the speaker has an economic motivation for the speech.

*Orthopedic Bone Screw,* 193 F.3d at 793 (citations omitted). "An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial." *Id.*

■ Applying this test to the instant case, the court finds that Bell is engaged in commercial speech. The NITE website (http://www.nite.org) serves as an adver-

tisement. Indeed, it is an internet version of a television *"infomercial."* (*See* Doc. 36, Exhibit C). The website attempts to entice the reader to join NITE and to pay Bell for tax advice. (*See, e.g.,* Doc. 36, Exhibit C, pg. 1) ("Unlike others who peddle arguments that may sound similar on the surface, our strategies have proven success, as the Internal Revenue Service (IRS) itself (as well as U.S. Attorneys and Federal Judges) has accepted NITE's arguments as valid. . . ."). Nearly every page of Bell's NITE website contains some element of self-promotion.

A basic member of NITE gets "access to the Members Hall [7] for $195.00 . . . renewable yearly for $75." (Doc. 36, Exhibit C, pg. 108) (ellipses in original). To become a Senior Fellow a member must pay an additional $3,500.00. (Doc. 36, Exhibit C, pg. 109). The website refers to certain products for sale (seminars on tape, for example) along with Bell's fee for each product. (*See* Doc. 36, Exhibit C, pp. 53–61; Exhibit K, Exhibit 16).

Clearly, Bell has an economic motive in posting the NITE website. He admitted at the preliminary injunction hearing that he receives remuneration from NITE members for the services he provides. N.T. at 46. Moreover, undisputed record evidence establishes that Bell received $68,179.50 via internet payments between May 18, 2000, and February 8, 2002. (Doc. 36, Exhibit L). Therefore, the court concludes that Bell's conduct falls squarely within the definition of commercial speech.

■ Although the First Amendment protects commercial speech generally, it does not protect *false* commercial

---

**7.** Touted as the ultimate service sold to NITE members, aside from personal meetings with Bell himself (at a charge of $125 per hour, Doc. 36, Exhibit C, pg. 109), the "Members Hall is a restricted access area of the NITE web site which holds the developed strategies, information, letters, news updates, articles, and other tools needed to avoid and eliminate any appearance of legitimacy of claims of taxes owed, and apparent liabilities." (Doc. 36, Exhibit C, pg. 108).

speech. *Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 949 (3d Cir.1993) ("[I]t is well settled that false commercial speech is not protected by the First Amendment and may be banned entirely.") (citing *Bates v. State Bar of Ariz.,* 433 U.S. 350, 383, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it. . . ."); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771–72 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). "[T]he First Amendment does not protect commercial speech about unlawful activities." *Orthopedic Bone Screw,* 193 F.3d at 792 (quoting *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 497 n. 7, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996)). Moreover, the prior restraint doctrine does not apply where there has been "an adequate determination that [the expression] is unprotected by the First Amendment." *Castrol,* 987 F.2d at 949 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)).

Accordingly, Bell's false commercial speech is not protected by the First Amendment. Therefore, an injunction prohibiting Bell from producing or disseminating false commercial speech would not violate his First Amendment rights.

ii. *Incitement to Imminent Lawless Action*

Bell also argues that an injunction would infringe on his freedom to engage in political speech, which is non-commercial in na-

ture. The United States counters that enjoining Bell's non-commercial advocacy of the U.S. Sources argument would not violate the First Amendment if tailored to prohibit only incitement to lawless action.

█ An injunction prohibiting non-commercial speech can pass constitutional muster if it is narrowly drawn to prohibit only unprotected speech. *See U.S. v. Kaun,* 827 F.2d 1144, 1150 (7th Cir.1987) ("the injunctive order does not impermissibly infringe upon Kaun's freedom of expression and freedom of association, because it constrains only unprotected speech").

█ Non-commercial advocacy of lawless action is not *per se* unprotected speech. However, advocacy of law violation can be proscribed "where such advocacy is directed to inciting or producing imminent lawless action and *is likely to incite or produce such action.*" *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (emphasis supplied). Injunctions prohibiting non-commercial advocacy of tax schemes similar to Bell's have been upheld to the extent that they comply with *Brandenburg. See U.S. v. Raymond,* 228 F.3d 804 (7th Cir.2000); *Kaun,* 827 F.2d at 1150–52.

█ At the hearing on this motion, counsel for plaintiff stated that "[t]he government is not trying to shut down Bell's website. The government is asking the court to simply enter an injunction that stops his false commercial speech, stops incitement to imminent lawless action, and stops his course of illegal conduct, helping others to evade their taxes." N.T. at 8. In light of the preceding discussion, the court believes that such an injunction would pose no threat to Bell's constitutional rights.

Therefore, the court finds that the balance of harms counsels in favor of enjoining Bell's improper conduct. *Accord U.S.*

*v. Rosile*, 2002 WL 1760861 *1; *U.S. v. Bosset*, 2002 WL 1058105 *1.

### D. *Public Interest*

Plaintiff argues that a preliminary injunction would be in the public interest because it will slow the spread of the frivolous U.S. Sources argument, thus saving government resources needed to track down refunds improperly paid to Bell's clients. Furthermore, an injunction will help protect Bell's clients from tax penalties resulting from using the U.S. Sources argument on their tax return forms. (Doc. 35, pg.24) (citing *U.S. v. Mathewson*, 1993 WL 113434 *2 (S.D.Fla.1993) ("the collection of taxes certainly serves the public interest....")). The court agrees.

 Proper administration of the laws is in the public interest. *U.S. v. Knudson*, 959 F.Supp. 1180, 1187 (D.Neb. 1997) ("[T]here is a strong public interest in assuring the proper and efficient functioning of the government. This includes the fair administration of federal tax laws...."). Furthermore, Bell is harming his clients (who often become the target of IRS sanctions) and all law-abiding taxpayers. *See U.S. v. Venie*, 691 F.Supp. 834, 839 (M.D.Pa.1988) (finding that an injunction is in the public interest when necessary to stop a person from "placing literally hundreds of taxpayers in financial difficulty"). Clearly, the public interest is served by enjoining Bell from further providing harmful tax advice. Therefore, the

court finds that the United States has met its burden for a preliminary injunction under section 7402.[8]

### IV. *Conclusion*

For the foregoing reasons, the court will grant the plaintiff's motion for preliminary injunction. An appropriate order will issue.

### *ORDER*

AND NOW, this 10th day of January, 2003, in accordance with the accompanying memorandum, it is hereby ORDERED that plaintiff's motion for preliminary injunction (Doc. 34) is GRANTED. It is further ORDERED that:

1. Thurston Bell and his representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with him, are preliminarily enjoined from directly or indirectly, by means of false, deceptive, or misleading commercial speech:

 a. Organizing, promoting, marketing, or selling (or assisting therein) the tax shelter, plan, or arrangement known as "the U.S. Sources argument" (also known as "the section 861 argument") or any other abusive tax shelter, plan or arrangement that incites taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabili-

---

8. The court notes that a preliminary injunction is also proper under 26 U.S.C. § 7408. Section 7408 provides alternative grounds for the issuance of injunctive relief. *U.S. v. Estate Preservation Services*, 202 F.3d 1093, 1098 (9th Cir.2000). Under section 7408, the United States must prove (1) that Bell has engaged in conduct subject to penalty under section 6700 or section 6701, and (2) that injunctive relief is appropriate to prevent recurrence of such conduct. 26 U.S.C. § 7408.

Bell is clearly engaged in conduct subject to sanction under sections 6700 (promoting a tax shelter) and 6701 (assisting in the preparation of tax forms that understate the taxpayer's tax liability) by advocating and selling the U.S. Sources argument; he also testified that he would continue to do so if not enjoined. *See* N.T. at 47. Therefore, injunctive relief is authorized under section 7408 as well as section 7402.

ties or unlawfully claim improper tax refunds;

b. Further engaging in any conduct subject to penalty under 26 U.S.C. § 6700, *i.e.* making or furnishing, in connection with the organization or sale of an abusive shelter, plan, or arrangement, a statement they know or have reason to know is false or fraudulent as to any material part;

c. Further engaging in any conduct subject to penalty under 26 U.S.C. § 6701, *i.e.* assisting others in the preparation of any tax forms or other documents to be used in connection with any material matter arising under the internal revenue laws and which they know will (if so used) result in the understatement of income tax liability; and

d. Further engaging in any conduct that interferes with the administration and enforcement of the internal revenue laws.

2. Bell shall forthwith send a letter to:

a. All persons to whom he gave, sold, or distributed any materials espousing or related to the U.S. Sources argument;

b. All persons for whom Bell prepared or assisted in the preparation or drafting of any federal returns or tax-related documents; and

c. All persons who contacted Bell regarding the U.S. Sources argument (in paper, via telephone, or through electronic means);

and inform those persons of the entry of the court's findings concerning the falsity of Bell's representations, the falsity of the tax returns based in whole or in part on the U.S. Sources argument, the possibility of the imposition of frivolous-return penalties against them, the possibility that the United States may seek to recover any erroneous refund they may have received, and the fact that a preliminary injunction has been entered against Bell (and attach a copy of this Order to the letter); and Bell shall simultaneously serve copies of *all* such letters (without attachment) to counsel for the United States at the address listed on the docket of this matter; and

3. Bell shall maintain the NITE website (www.nite.org) during the pendency of this preliminary injunction Order, remove from the aforementioned website all abusive-tax-shelter-promotional materials, false commercial speech, and materials designed to incite others to violate the law (including tax laws), and display prominently on the first page of the website an attachment of this preliminary injunction Memorandum and Order.

4. Bell shall mail to counsel for the United States, at the address listed on the docket of this matter, one copy of every federal tax return, amended return, or other document intended for the IRS that he prepares, or assists in the preparation of, on behalf of any other person or entity during the pendency of this preliminary injunction Order. The mailing shall be made on the same date the document is mailed to or filed with the IRS.

5. If Bell requires access to any file in the court's possession in order to comply with this order (e.g. paragraph 2), Bell shall promptly contact the court's deputy clerk, Ms. Kimberly McKinney, at 221–3920 to schedule an appointment for document access.

6. The parties shall file a request for a permanent injunction hearing within thirty (30) days. If no such request is filed, the Court will issue an order converting this

preliminary injunction to a permanent injunction.