Nadia MACHESKA, Plaintiff,

v.

**THOMSON LEARNING and Harcourt Learning Direct, A Harcourt Higher Learning Co., Defendants.**

**No. 3:03 CV 1942.**

United States District Court, M.D. Pennsylvania.

Dec. 7, 2004.

Paul M. Jennings, Scranton, PA, for Plaintiff.

Thomas B. Schmidt, III, Pepper Hamilton, LLP, Harrisburg, PA, for Defendant.

## MEMORANDUM AND ORDER

JONES, District Judge.

### THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Following Nadia Macheska's ("Macheska" or "Plaintiff") voluntary dismissal of all claims against Thomson Learning and Harcourt Learning Direct ("Thomson" or "Defendants"), the Defendants filed this Motion for Fees and Costs (doc. 30) against Macheska's counsel of record, Paul M. Jennings, Esq., ("Jennings") pursuant to 28 U.S.C. § 1927.

This case arose out of the termination of Plaintiff's employment at Thomson on September 17, 2001 and the legality of the Separation Agreement and General Re-

lease (the "Release") signed by the Plaintiff on November 5, 2001, and by Thomson's Vice President Steven A. Moll ("Moll") on December 1, 2001. On October 31, 2003, Macheska initiated this action, wherein she alleges that she lacked the capacity necessary to legally execute the Release. Following somewhat limited but costly and time-consuming discovery by Thomson, as well as an aborted attempt to appoint a guardian for Macheska in the Lackawanna County Court of Common Pleas, Macheska voluntarily withdrew all of her claims against Thomson. Subsequently, the instant motion seeking costs and fees was filed by Thomson. A timely response was filed by Jennings, and oral argument was conducted on October 25, 2004. At oral argument, certain additional exhibits were requested and received by the Court. Following these supplements to the record by both parties, the Motion is now ripe for our review.

We will grant Thomson's Motion to the extent that we will consider an award of fees and costs incurred by Thomson between March 1, 2004 and July 7, 2004.

### STATEMENT OF FACTS:

The facts relevant to our disposition of this Motion, and which we will review, commence with the Plaintiff's termination by Thomson and extend through July 2004, when the underlying suit was voluntarily withdrawn by her. Since, as noted, Thomson asserts this claim against Jennings, we will in particular emphasize his conduct as Macheska's counsel during the pendency of the lawsuit which gives rise to this action.

#### A. *Macheska's Separation Agreement with Thomson Learning*

Macheska was employed by Thomson Learning, and its corporate predecessors, for thirty-three years, until her employment was terminated on September 17, 2001. (doc. 1; Complaint ¶ 11). The exact circumstances of Macheska's termination are unclear. However, it appears that she was diagnosed as afflicted with adjustment disorder with depressive mood, and that she was terminated by the Defendants following many months of turmoil regarding her employment. Defendants then offered Macheska the Release, which included sixty-six (66) weeks of severance pay with benefits. The Release also included reimbursement for unused vacation days as well as job outplacement counseling. (Def. M. to Dismiss Ex. B; Release ¶ 3).

Macheska then embarked on an extended odyssey during which she consulted with a number of attorneys regarding her termination and the proposed Release. Macheska first consulted with an employment law attorney, Joseph Sileo, Esq. Sileo met with Macheska on October 1, 2001 to discuss her termination from Thomson and to explain the various legal avenues she could pursue. Sileo spent four hours at Macheska's residence discussing the relevant aspects of her employment. Sileo stated in his deposition, "[t]here was nothing to me that would indicate that she was incapacitated or incompetent, if you will, for the purposes of what we were discussing [the Release]." (doc. 31; Def. Br. for Fees Ex. 4; Sileo Dep. at 38.). Sileo recommended that Macheska accept the severance offered by Thomson.

Subsequent to her extended consultation with Sileo, Macheska sought the advice of another attorney, Doug Thomas, Esq., to whom she was directed to by her physician, Dr. Richard Martin.[1] Later in Octo-

---

1. Jennings has interposed the argument that this lawyer shopping by Macheska was a symptom of her incapacity. Not only do the facts indicate otherwise, but it appears to us

ber 2001, she first spoke with Thomas, who is a trusts and estates lawyer and who then recommended to her an employment lawyer, Andrew Katsock, Esq. Both Thomas and Katsock met with Macheska at her home on October 8, 2001 for two to three hours. Both attorneys testified in their depositions that Macheska was entirely competent during both that meeting and in later conversations between Katsock and Macheska. (doc. 31; Def. Br. for Fees Ex. 6, Katsock Dep. at 20–24; Ex. 3, Thomas Dep. at 24–28.). Both attorneys strongly recommended to Macheska that the severance offered by Thompson represented a good deal for her. Because Macheska signed the Release during their representation of her, Thomas and Katsock also concluded that she did so knowingly and voluntarily, after the lengthy period within which she evaluated her options. (doc. 31; Thomas Dep. at 1, Katsock Dep. at 59–60).

In addition to consulting the three previously noted attorneys, it is notable that Macheska was observed and treated by two physicians during the same period. First, Macheska met with her treating physician, the aforementioned Dr. Richard Martin, several times in the Fall of 2001. Macheska had been a patient of Dr. Martin since prior to 2000. On January 5, 2000, Dr. Martin diagnosed Macheska with "adjustment disorder with depressive mood." (doc. 31; Def. Br. for Fees Ex. 9; Martin Dep. at 7–8.). Dr. Martin also met with Macheska on the day she was terminated, (September 17, 2001), once during the period she was considering signing the Release, (October 8, 2001), and again three days after she signed the Release, on November 8, 2001. Dr. Martin, while agreeing that Macheska needed a leave of absence from her work, did not believe that she was incompetent or that she could not

understand and voluntarily sign the Release. (doc. 31; Def. Br. for Fees Ex. 9; Martin Dep. at 71–74.). In fact and as noted, it was Dr. Martin who referred Macheska to attorney Thomas for further explanation of her legal rights.

Macheska was also treated during the same period by Dr. Daniel de Soto, a psychiatrist who met with her on October 4, October 19, and November 12, 2001. After taking detailed background information on Macheska, Dr. de Soto evaluated her condition as "moderate," saying that she was alert, with coherent speech, relevant thoughts, and without any more severe symptoms such as suicidal tendencies, hallucinations, or delusions. Dr. de Soto concluded that Macheska was a future-oriented individual able to consent to treatment. (doc. 31; Def. Br. for Fees Ex. 13; Dr. de Soto Report at 2.). In his opinion, she was competent to both consider the severance offer and sign the Release. *Id.*

In summary, the magnitude of the evidence demonstrating that Macheska was competent at all of the times during which she considered the severance and Release, as well as at the moment she signed the Release, is overwhelming. This evidence includes her consultation with no less than three attorneys (Sileo, Thomas, and Katsock) and two physicians (Drs. Martin and de Soto). Thomson also extended the statutory seven day waiting period three times, thus allowing Macheska more time to consider her options. In the face of this factual panoply, and after having signed the Release, Macheska presented herself to Jennings in March 2002. Sadly, and as noted below, we can only conclude that Jennings utterly failed to conduct an appropriate investigation into the circum-

that Macheska was likely receiving opinions regarding her situation that she did not want to hear, and thus rejected in turn each of the messengers.

stances surrounding Macheska's execution of the Release.[2]

It is relevant to our determination that both attorneys Katsock and Thomas provided sworn affidavits stating that:

> [u]ntil [ ] deposed in this case, Mr. Jennings never asked me about the circumstances surrounding Ms. Macheska's execution of her severance agreement with Thomson, about my discussions with her concerning the severance agreement, or about my observations of her mental capacity at the time she executed the agreement or while I represented her.

(doc. 31; Def. Br. for Fees Ex. 7, 8; Affidavit of Doug Thomas ¶ 4; Affidavit of Andrew Katsock ¶ 2).

### B. *Jennings' Complaint and the Expert Reports it Relied Upon*

After consulting with Macheska for over a year, Jennings filed the instant action on October 30, 2003, just as the statute of limitations was about to expire. His two count complaint alleged: (1) that Thomson violated the Americans with Disabilities Act by terminating Macheska's employment because of her disability, and (2) that Thomson violated the Family and Medical Leave Act by terminating Macheska when she requested medical leave. (doc. 1 ¶¶ 90–106).

In his complaint and in pre-filing correspondence to Thomson, Jennings made several problematic assertions. First, in the complaint, Jennings alleged that "Plaintiff clearly could not make an informed decision." (doc. 1 ¶ 75). It is now evident, however, that during the extended period which he counseled Macheska prior to the filing of the complaint, not once did Jennings endeavor to speak to the aforementioned attorneys or physicians, all of whom were satisfied with Macheska's ability to comprehend the Release.

Next, more troubling misrepresentations occurred when Jennings attempted to use the reports of his retained experts, psychi-

---

2. The Release contains the following relevant language:

(4) Ms. Macheska makes the following promises to Thomson Learning in consideration for the execution of this [Severance] Agreement and the performance of its terms and conditions. Specifically:

(a) Ms. Macheska voluntarily, irrevocably, and unconditionally releases and discharges Thomson Learning from any and all complaints, demands, contracts, liabilities actions, causes of action, promises . . . against Thomson Learning . . . in any way connected with her employment relationship or separation from employment at Thomson Learning . . .

. . . . . . .

(c) Ms. Macheska further agrees to the fullest extent permitted by law that she will not file with any court or agency any charge or complaint at any time which relates in any way to her employment with or separation from Thomson learning. . . .

(d) Ms. Macheska specifically and expressly acknowledges that this Agreement is in-

tended to include and extinguish all claims known and unknown, which exist up to the date of execution of this Agreement . . . and that no possible claim against Thomson Learning would materially affect or change her complete and voluntary acceptance of this Agreement. . . .

5..

(a) Ms. Macheska acknowledges that . . . she has had the opportunity to review and reflect on all terms of this Agreement . . .

(d) By initialing below, Ms. Macheska acknowledges that she has consulted with an attorney regarding this Agreement . . . and has considered carefully every provision of this Agreement . . . and that after having engaged [in this consultation] prefers to and has requested that she enter into this Agreement. [Macheska's initials and the date follow this paragraph]

. . . . . . .

(doc. 4; Def. M. to Dismiss Ex. B; Release ¶¶ 4–5).

atrists Dr. Michael A. Church and Dr. Richard A. Fischbein, to show that Macheska was mentally unstable at the time she signed the Release. According to his deposition, Dr. Fischbein was retained by Jennings on March 27, 2002 and asked by him to examine Macheska and prepare a written report. Regrettably, in this process, Jennings led Dr. Fischbein to believe that he would provide sworn declarations of "individuals who inter-acted [sic] with Ms. Macheska during the time frame of her execution of that legal document [the Release]." (doc. 31; Def. Br. for Fees Ex. 11; Jennings letter to Fischbein of 3/27/02) who would support a finding of her incompetence. In fact, Jennings did nothing of the sort, obviously because he *could not* produce any declarations of that nature. As a consequence, Dr. Fischbein proceeded to construct his analysis based on a false premise as related to him by Jennings.

Dr. Fischbein then prepared two reports. Notably, his second report contained small but quite significant changes from the first. Dr. Fischbein submitted his first report to Jennings on April 3, 2002. This report included the following conclusion:

> It is clear to this examiner that [Macheska] needed legal advice at the time and *needed to consult with an attorney* before making such an important decision and she was in no frame of mind to make that decision by herself.

(doc. 31; Def. Br. for Fees Ex. 16; Dr. Fischbein Report of 4/3/02 at 8.). Jennings reviewed this preliminary report and sent a fax to Dr. Fischbein indicating some of his "problems with the report." (doc. 31; Def. Br. for Fees Ex. 17; Jennings fax to Dr. Fischbein of 4/15/02).[3] Within his fax to Dr. Fischbein, Jennings included a request to change the date of the report, and an instruction regarding the "claim of Dr. Fischbein [that Macheska needed to consult with an attorney] is *destructive* & wrong. She had two attorneys at the time." *Id.* (emphasis in original). Jennings' fax went on to state: "Remind Dr. Fischbein that I told her she had 2 attorneys and to have him write up a report *consistent with the facts of being unable to render a decision* at that time." *Id.* (emphasis added). .

Dr. Fischbein accepted Jennings' changes and issued a second report dated April 13, 2002.[4] This report contained a revision of Dr. Fischbein's earlier conclusion in his first report concerning the lack of legal advice to Macheska, and stated that:

> whatever legal advisors she had at the time should have requested a consult with a psychiatrist of psychologist before permitting Ms. Macheska to make such an important decision [signing the Release].

(doc. 31; Def. Br. for Fees Ex. 18; Fischbein Report of 3/13/02 at 8.). Thus, bolstered by new information from Jennings, Fischbein altered his report. Evidently

---

**3.** We note that some confusion exists in that Jennings' memo to Dr. Fischbein is actually addressed to Nadia Macheska and discusses Fischbein as if he was not the intended recipient of the memo, which included a fax cover sheet addressed to Fischbein that reads "DR RE FISCHBEIN" and "FOR YOUR EYES ONLY" in a large circle. It is unclear why the cover sheet was addressed to Fischbein while the memo was addressed to Macheska.

However, we need not speculate further as to why this took place, as it is not material to our determination in any event.

**4.** We now know that this report was backdated because its date of April 13, 2002 is two days prior to Jennings' April 15, 2002 fax to Fischbein, and further note that the report contains information from the said later fax.

unknown to Dr. Fischbein, due to Jennings' failure to reveal it, was the fact that Macheska had in fact consulted not only with a psychiatrist but also her treating physician at, or directly prior to, and after the point when she signed the Release, and that both physicians had found her to be competent and able to understand her legal rights.

Jennings also misled another retained expert, Dr. Michael Church (who later performed a psychological examination of Macheska) when, in his original instructions to Dr. Church, he wrote: "I believe that there is support to invalidate that signature." (Hearing Ex. 4; Jennings letter to Church of 3/27/02). It is apparent that this is at best speculation by Jennings with no basis in fact, much like his pre-evaluation comments to Dr. Fischbein.

## C. *Jennings' Conduct Following the Commencement of Litigation*

Not long after Jennings filed the underlying action against Thomson, Thomson filed a Motion for Summary Judgment and/or to Dismiss (doc. 4). In essence, Thomson alleged that the complaint failed to state a claim upon which relief could be granted because Macheska had signed the Release and had accordingly relinquished her rights to bring an action against Thomson.

We held oral argument on Thomson's Motion on February 19, 2004. Following the argument, in an Order issued that same day, we denied Defendant's Motion to Dismiss, deferred ruling on the Motion for Summary Judgment, and allowed for a limited ninety (90) day discovery period in aid of our resolution of the Motion. We took this step in the interest of providing Macheska the opportunity to develop facts in support of her contention that the Release did not act as a bar to her suit. In particular, Jennings represented to the

Court during oral argument that his experts, if given the opportunity, would support Macheska's claim that she lacked the capacity to sign the Release. Although Macheska's cause of action appeared tenuous, we considered the course of action ordered by us to have been in the interest of justice, and an alternative to dismissing Macheska's claims at that juncture.

Less than a week after the oral argument held February 19, 2004, Jennings contacted our chambers via fax with two requests. (Jennings fax to the Court of 2/23/04). First, Jennings asked the Court for assistance in appointing a legal guardian for Macheska, who could "not understand what is being told to [her, regarding this litigation.]" *Id.* Second, Jennings asked the Court to stay the proceedings while he attempted to have a guardian appointed.

In this letter, Jennings stated:

I represent to the Court that I informed Nadia Macheska that I will *strongly recommend* to a Guardian that this *case be withdrawn, with prejudice,* and that acceptance of the 66 weeks of pay occur, as offered to me by Atty. Steven [sic] Sundheim at the conclusion of oral argument [on February 19].

*Id.* (emphasis added). Thus, it is significant that as early as February 23, Jennings understood that Macheska's case lacked merit and should have been withdrawn. We can easily infer that Jennings' client either did not, or could not, agree with his recommendation to her in that regard. Facing this, Jennings, in what now appears to have been a moment of extreme and perhaps ill-advised candor, conceded to both opposing counsel and the Court that, in his view, his client's case should not proceed further. We note parenthetically that the 66 weeks referenced in Jennings' letter referred to the resumption and completion of the previously

agreed to compensation, and not to any additional consideration by Thomson, since payments had been suspended by Thomson after Macheska filed suit to open the Release.

Following this fax, and a fax response to the Court from Thomson not concurring in Jennings' request for a stay (and in fact questioning why the case could not be dismissed forthwith), an informal conference call involving counsel and the Court was held on March 1, 2004. As according to our usual protocols, this call was an off-the-record attempt to resolve the matters raised in Jennings' letter without the necessity of a formal motion. The substance of this call can be summarized thusly: Jennings reiterated that he had advised Macheska to withdraw her action; that Macheska would not consent to same; that Jennings believed that Macheska might not be competent to make any decision with respect to her case and thus he intended to seek the appointment of a legal guardian for her; and, as a result of all of this, that Jennings had sought the consent of Thomson's counsel to extend the discovery deadlines implemented by our February 19, 2004 Order. Thomson's counsel would not agree. Because as noted this was an informal conference call, we advised Jennings that in the absence of an agreement, his only alternative was to file a formal motion to extend the discovery deadlines if he in fact proceeded with the guardianship on Macheska's behalf, citing M.D. Local Rule 7.1. For reasons unknown to us, Jennings never filed such a motion, and the discovery deadlines remained in place.

We now know that on the day following the informal conference call with this Court, a guardianship action was filed in the Lackawanna County Court of Common Pleas on Macheska's behalf. Our examination of the record of that proceeding, which was submitted as a supplement to the record at our request, reveals that the action appeared to follow a normal course, with one critical and significant exception. On the eve of the entry of a final order appointing a guardian for Macheska, the action was withdrawn on June 30, 2004.

While the guardianship proceeding was developing, and because Jennings did not obtain a stay of discovery, that process rolled onward. Depositions of Drs. de Soto, Fischbein, Church, and Martin, as well as attorneys Sileo, Thomas, and Katsock were noticed and taken by Thomson, as was the additional deposition of Macheska's therapist, Helen Hughes.

A reasonable person might question why Thomson chose not to agree to permit Jennings to stay the action in the face of the guardianship proceeding. However, an examination of the facts tends to verify why Thomson did not so agree. Thomson's counsel, Stephen J. Sundheim, Esq., stated in a letter to Jennings prior to the March 1, 2004 conference call with the Court that: "I do not agree that a stay is warranted. I still have not seen any contemporaneous evidence that plaintiff was so impaired that, from a legal standpoint, she was not able to agree to the release." (doc. 46; Def. Supp. Ex. 14; Sundheim letter to Jennings of 2/27/04). Moreover, Thomson certainly had no assurance that the guardianship process would result in the appointment of a guardian who presumably would make the determination which Jennings had represented that Macheska could not, i.e. whether to proceed with her claim against Thomson, and in fact it *did not* so conclude. Faced with Thomson's position, Jennings clearly had the option of filing either a formal motion to stay discovery as aforestated, or to withdraw as her counsel. It is critical to our analysis that he did neither. Rather, Jennings allowed Thomson to incur signifi-

cant costs during discovery despite his belief that the "case should be withdrawn." (Jennings fax to the Court of 2/23/04).

At this point in our analysis, it is well to revisit the fact that as early as his February 23, 2004 fax to the Court, and during the March 1, 2004 telephonic conference, Jennings made representations that he had recommended that Macheska withdraw her action because it lacked merit. However, despite these admissions, months later on June 11, 2004, Jennings made a proposal to settle the action for $26,000, which was rejected by Thomson. (doc. 46; Def. Supp. Ex. 43; letter from Jennings to Sundheim of 6/16/04). Notably, in the face of this "last gasp" attempt to settle a case that he himself had concluded some three and one-half months previously had no merit, Jennings folded his hand and as a result the guardianship action was discontinued on June 30, 2004 and then the underlying suit on July, 7, 2004.

Finally, it is also relevant to our analysis that the Motion before us is far from the first indication by Thomson that they intended to seek fees and costs from Jennings. In fact, in what appears to be the first written correspondence from Thomson to Jennings there was included an indication of an intention to: "seek all appropriate remedies including our costs." (doc. 46; Def. Supp. Ex. 1; Moll letter to Jennings of 3/20/02). In later correspondence, Thomson and its counsel at Pepper Hamilton LLP also indicated an intention to seek fees and costs. For example, a March 17, 2004 letter from defense, Glenn A. Beard, Esq., to Jennings, expresses that if Jennings intended to withdraw the case, he should do so soon, because "continued litigation [was] a material breach of the severance agreement." (doc. 46; Def. Supp. Ex. 23; Beard letter to Jennings of 3/17/04). An e-mail, from attorney Sundheim dated March 18, 2004, indicated, "my client will seek all of its costs." (doc. 46; Def. Supp. Ex. 24; Sundheim e-mail to Jennings of 3/18/04). Another letter from attorney Sundheim, dated April 8, 2004 stated, "I wanted to advise you that, if we obtain dismissal of this action, my client intends to seek to recover all of the costs it incurs. Of course, all of these costs are a direct result of what my client views as a breach of the settlement agreement and release." (doc. 46; Def. Supp. Ex. 30; Sundheim letter to Jennings of 4/8/04). Another letter from attorney Beard, in advance of the deposition of Dr. de Soto, dated April 22, 2004 explained:

> Our client is distressed by the mounting costs of this baseless and apparently frivolous litigation. Please take this opportunity either to tell us what evidence we are miscomprehending or to rethink whether you should maintain this lawsuit any longer. If your client will agree to dismiss the action with prejudice *before we proceed with the deposition* of Dr. de Soto on April 30, then our client will refrain from taking further action based on what it believes is the prosecution of a patently meritless lawsuit. Please be advised, however, that any such dismissal would not affect our client's position that Ms. Macheska's filing and maintaining the suit breached the release agreement and forfeited her right to the severance benefits it provided."

(doc. 46; Def. Supp. Ex. 36; Beard letter to Jennings of 4/22/04). A final letter from attorney Sundheim was sent to Jennings on June 8, 2004 reiterating his:

> increasingly grave concerns regarding the frivolousness of this lawsuit.... Please be advised that, if our client is forced to spend more money briefing the motion for summary judgment, we intend to move for sanctions against you

under Fed.R.Civ.P. 11, seek attorneys' fees from your client under the ADA and consider a separate action for wrongful use of civil proceedings under Pennsylvania law. We urge you to withdraw your complaint with prejudice immediately.

(doc. 46; Def. Supp. Ex. 41; Sundheim letter to Jennings of 6/8/04). In the face of these repeated warnings, which began as rifle bursts but then escalated to cannon shots across his bow, Jennings allowed Thomson to expend considerable resources in defending what Jennings himself had long since concluded was a baseless claim.

### D. *Thomson's Costs Accrued in Defense During this Litigation*

From the records and affidavit submitted by Thomson's counsel, Pepper Hamilton LLP, we are able to discern that Thomson was billed a total of $99,396.22 for the defense of this action, which was comprised of $84,393 in attorney's fees, $11,393.32 in costs, and $3,610 in expert witness fees. (Def. Counsel Aff. ¶¶ 5–8). From the records, it appears that Pepper Hamilton billed Thomson at the end of every month for all non-attorney costs and fees. We note that in the period following March 1, 2004 Pepper Hamilton billed approximately $7686.86 to Thomson for non-attorney fees and costs in this matter. *Id.* The attorney's fees in this case were not broken down in the same manner, and thus we cannot calculate, on the record before us, the precise amount of attorney's fees incurred and paid by Thomson to Pepper Hamilton for certain individual periods. We are thus dealing with fee amounts which we cannot precisely calcu-

**5.** Fed.R.Civ.P. 41(a)(1) provides, in relevant part:
"... an action may be dismissed by the plaintiff without order of the court"

(ii) by filing a stipulation of dismissal by all

late, but that will not forestall an analysis of the merits of Thomson's claim.

### *DISCUSSION:*

Jennings' mistakes in handling this matter are manifest and obvious. Perhaps his most fatal error, however, was the failure to properly seek a stay of discovery after initiating the guardianship action in state court, once he had concluded in late February 2004 that the "case be withdrawn, with prejudice." (Jennings fax to the Court of 2/23/04). Unquestionably, such a motion would have been seriously considered and likely granted by the Court. Further, and as expressed previously, Jennings had the additional options of terminating his relationship with Macheska with her consent, or in the face of a refusal by her to allow him to withdraw as counsel, he could have sought to have the Court permit his withdrawal over her objection. Because he elected none of these options, and since he knowingly exposed Thomson to significant costs in aid of bringing this matter to a conclusion, we will now proceed to evaluate both the merits of Thomson's Motion, as well as any defenses asserted by Jennings.

### A. *Thomson's Stipulation of Dismissal does not Bar the Instant Motion*

■ Jennings has raised a threshold issue in response to the Motion by Thomson. That is, Jennings, through his counsel, avers that any right Thomson had to recover fees and costs was waived by the stipulation of dismissal pursuant to Fed.R.Civ.P. 41(a)(1).[5] We find this argument to be unavailing.

parties who have appeared in the action ...

Thomson's Motion is brought pursuant to 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

Jennings argues that a Motion pursuant to § 1927 is barred in this Court because we lost subject matter jurisdiction once the case was removed from our docket by the stipulation of voluntary dismissal with prejudice. However, according to Fed. R.Civ.P. 54, "[t]he provisions of subparagraphs (A) through (D) [limiting, *inter alia,* to fourteen days the time in which a motion for fees and costs can be filed] do not apply to claims for fees and expenses as sanctions for violations of these rules or under 28 U.S.C. § 1927." Fed.R.Civ.P. 54(d)(2)(E).

Several courts have held that a voluntary dismissal pursuant to Fed.R.Civ.P. 41(a)(1) does not remove jurisdiction from the district court with respect to a motion for fees and costs pursuant to 28 U.S.C. § 1927. In *Bolivar v. Pocklington,* the First Circuit explained that a § 1927 motion is a collateral matter. As such, courts properly retain jurisdiction following dismissal. 975 F.2d 28, 31 (1st Cir.1992); *see also Szabo Food Serv., Inc. v. Canteen Corp.,* 823 F.2d 1073, 1079 (7th Cir.1987) ("The obligation to answer for one's act accompanies the act; a lawyer cannot absolve himself of responsibility by dismissing his client's suit."). The Supreme Court addressed this in *Cooter & Gell v. Hartmarx Corp.,* when it held that, "district courts may enforce Rule 11 even after the plaintiff has filed a notice of dismissal

under Rule 41(a)(1)." 496 U.S. 384, 395, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In his concurrence, Justice Stevens explained that this was equally applicable to § 1927. *Id.* at 412 (Stevens, J. concurring in part and dissenting in part)("I agree that dismissal of an action pursuant to Rule 41(a)(1) does not deprive the district court of jurisdiction to resolve collateral issues. A court thus may impose sanctions for contempt on a party who has voluntarily dismissed his complaint or impose sanctions under 28 U.S.C. § 1927 against lawyers who have multiplied court proceedings vexatiously.").

At oral argument, counsel for Jennings argued that subsequent changes to Rule 11 no longer make *Cooter & Gell* applicable to a motion brought pursuant to § 1927. While in some areas this may be so, courts have repeatedly upheld the holdings of both *Cooter & Gell* and *Bolivar* since Rule 11 was most recently updated in 1993, inasmuch as they apply to a post-dismissal filing of a § 1927 motion. *See Thomason v. Norman E. Lehrer, P.C.,* 182 F.R.D. 121, 127, 42 Fed.R.Serv.3d 335, 335 n. 1 (D.N.J.1998)(*citing Bolivar* for the proposition that the court could impose sanctions following dismissal); *Matos v. Richard A. Nellis, Inc.* 101 F.3d 1193, 1196 (7th Cir.1996)(citing *Cooter & Gell,* Judge Easterbrook held that a court lacking subject matter jurisdiction could nonetheless impose § 1927 sanctions).

Finally, we will briefly address the unpublished District Court decisions cited by Jennings. The first case cited, *Sokoloff v. General Nutrition Co.,* disallowed a motion for fees and costs filed pursuant to the terms of a franchise agreement that was the basis for the underlying lawsuit. *Sokoloff v. General Nutrition Companies, Inc.,* No. 00–641, 2001 WL 536072, *3 (D.N.J. May 21, 2001). This case did not discuss the statutory right to sanctions

pursuant to § 1927, but rather was an attempt by the movant to reopen litigation regarding the terms of the franchise agreement.

The second case cited by Jennings, *Dorfsman v. Law Sch. Adm. Council*, did not allow a motion for fees and costs because the defendants in that case were saved the expense of trial, as the case concluded on a motion to dismiss. No. 00–306, 2001 WL 1754726 (E.D.Pa. Nov.28, 2001). While it is true that Thomson was spared the cost of trial, it was not spared the cost of discovery, despite Jennings' stated belief prior thereto that the "case [should] be withdrawn." (Jennings fax to the Court of 2/23/04). We do not disagree with our colleague Judge Hutton that a motion for fees should only be granted following a voluntary dismissal in "exceptional circumstances." *Dorfman*, 2001 WL 1754726 at *3. As explained herein, we have determined that exceptional circumstances exist in this case, in that Jennings allowed the litigation to continue without appropriate pause, resulting in costly and time-consuming discovery, long after his admission that he had concluded that the case should "be withdrawn." (Jennings fax to the Court of 2/23/04). Therefore, we conclude that Thomson is not barred from asserting a § 1927 motion subsequent to the stipulated voluntary dismissal filed in this case.

**B.** ***Standard to be Applied under 28 U.S.C. § 1927***

■ Having determined that we have jurisdiction over this Motion, we next turn to the merits of Defendant's Motion. For a court to award fees and costs pursuant to 28 U.S.C. § 1927, the statute and relevant case law instruct us that we must examine whether counsel: "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions* 278 F.3d 175, 188 (3d Cir.2002) (*quoting Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1191 (3d Cir.1989)). Specifically, we must find that there was "behavior 'of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation.'" *In re Orthopedic Bone Screw Products Liability*, 193 F.3d 781, 795 (3d Cir.1999)(*quoting Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985)) (other internal citations omitted). We must, therefore, find "willful bad faith on the part of the offending attorney." *Id.*

■ The Third Circuit Court of Appeals has held that bad faith has an expansive definition and that it is a finding of fact to be made by the District Court. *See Hackman v. Valley Fair*, 932 F.2d 239, 242 (3d Cir.1991). Bad faith is evident when "claims advanced were *meritless*, that *counsel knew* or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *In re Prudential*, 278 F.3d at 188 (*quoting Smith v. Detroit Fed'n of Teachers Local 231, Am. Fed. of Teachers, AFL–CIO*, 829 F.2d 1370, 1375 (6th Cir.1987))(emphasis added). We find Jennings' bad faith to be evident both because of his February 23 and March 1, 2004 admissions that his client's case had no merit, as well as his failure to either stay, terminate the litigation, or withdraw as counsel within a reasonable period of time thereafter.

■■ We note with some caution that the remedy available to use under § 1927 is one we should choose to use sparingly. (*See In re Orthopedic*, 193 F.3d at 796) (holding that sanctioning powers should be used sparingly in order to avoid chilling

novel legal or factual arguments from counsel). As the Supreme Court held in *Christiansburg Garment Co. v. EEOC,* "[I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims...." 434 U.S. 412, 421–22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Here, we need not use hindsight nor *post hoc* analysis, but again refer to counsel's own words to the Court that "the case [should] be withdrawn."

■ Additionally, § 1927 does not allow us to award sanctions for all of the fees and costs Thomson accrued in defense of this action. *See Schutts v. Bentley Nevada Corp.* 966 F.Supp. 1549, 1559 (D.Nev.1997)("Section 1927 applies only to unnecessary filings and tactics once a lawsuit has begun: It is only possible to 'multiply' a proceeding after the complaint is filed."); *see also In re Keegan Management Co. Sec. Litig.,* 78 F.3d 431, 435 (9th Cir.1996). Therefore, we will limit any recovery by Thomson to the period during which it is apparent that Jennings needlessly prolonged the litigation, rather than the entirety of the litigation dating back to the filing of the complaint on Macheska's behalf. While as previously noted Jennings embarked upon an ill-considered course on Macheska's behalf from the very moment his representation commenced, his most egregious behavior was saved for the period after he conceded the futility of Macheska's claim.

### C. *Fees and Costs to be Awarded to Thomson*

Both Jennings and his counsel spill considerable ink arguing that Jennings pursued this litigation *ab initio* on behalf of

his client in good faith. The facts give us considerable pause in that regard, however, as it is readily apparent that Jennings utterly failed to undertake a responsible investigation of the circumstances surrounding Macheska's execution of the Release prior to forging ahead with the underlying lawsuit. Despite this deficient conduct, we believe that Thomson has not overcome the significant hurdle interposed by § 1927 as to conduct by Jennings prior to March 1, 2004. While as stated Jennings' course prior to that date was dubious and questionable at best, we cannot find that it was for a purpose so improper or inappropriate as to trigger an award of fees and costs.

■ By March 1, 2004 however, the underlying suit had been placed in a posture which we believe implicates the sanctions allowed by § 1927. At that point, Jennings clearly knew that his client's case lacked merit. Metaphorically, rather than pulling off of the road or applying the brakes, Jennings allowed his client's vehicle to tumble down a hill towards certain disaster. Sanctions under § 1927 are appropriate to "[D]eter an attorney under from *intentionally* and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay." *LaSalle National Bank v. First Connecticut Holding Group,* 287 F.3d 279, 288 (3d Cir.2002).

While Jennings argues that his actions post-March 1, 2004 were appropriate, we cannot agree. In particular, we are struck by the fact that in the face of a prior admission that his client's case had no merit, he persisted, as late as June 2004, in an attempt to accomplish a nominal settlement of her claim. We also derive an adverse inference from the fact that Jennings instigated a guardianship proceeding on his client's behalf, which was presumably for her benefit in areas not limited to

182

the underlying litigation. However, it is telling that upon the failure of Jennings' just described "eleventh hour" attempt to resolve the litigation, the guardianship proceeding evaporated, and Macheska was, in Jennings' evident view, suddenly competent and able to direct him to withdraw her action. Because we believe that Jennings had a larger obligation than he fulfilled to Macheska, this Court, and most of all to Thomson, we will consider an award comprising at least part, if not all of the fees and costs incurred by Thomson after March 1, 2004 in its defense of this matter.

As noted previously, we do not have a breakdown of the costs and fees incurred by Thomson subsequent to March 1, 2004. As such we will enter an appropriate order so that sanctions can be computed consistent with this analysis.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Fees and Costs (doc. 30) is GRANTED to the extent that the Court will consider an award of costs and fees accrued after March 1, 2004.

2. Within twenty (20) days of the date of this Order, Defendants' counsel will submit an itemized, month-by-month statement of its fees and costs as billed by Pepper Hamilton LLP and paid by Thomson from the period of March 1, 2004 to July 7, 2004.